FOR THE UNITED STATES:
JOHN BRODERICK
R. SHEA DIAZ
NATALIE G. HARRISON
Trial Attorneys
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
Broderick: (202) 305-0302
Diaz: (202) 514-3211
Harrison: (202) 305-0461

BEN KURUVILLA
Assistant United States Attorney
District of New Jersey
United States Attorney's Office
970 Broad Street, 7th Floor
Newark, New Jersey 07102
(973) 297-2085

FOR DEFENDANTS:
ISP Environmental Services Inc.
1361 Alps Road
Wayne, NJ 07470

G-I Holdings Inc.
818 Washington Street
Wilmington, DE 19801

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 22-CV-4344 |
| | ) | |
| ISP ENVIRONMENTAL SERVICES INC. and | ) | |
| G-I HOLDINGS INC., | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

The United States of America, by the authority of the Attorney General of the United States, acting on behalf of the Regional Administrator of the U.S. Environmental Protection Agency ("EPA"), Region 2, alleges as follows:

## NATURE OF THE ACTION

1.      This is a civil action against ISP Environmental Services Inc. ("IES") and G-I Holdings Inc. ("G-I") (collectively, "Defendants") seeking, pursuant to Sections 107(a) and 113(g)(2) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§ 9607(a) and 9613(g)(2), the recovery of unreimbursed response costs incurred, and to be incurred, in response to releases and threatened releases of hazardous substances into the environment at or from the LCP Chemicals, Inc. Superfund Site in Linden, Union County, New Jersey (the "Site" or "LCP Site").  The United States further seeks, pursuant to CERCLA Sections 106(b)(1) and 107(c)(3), 42 U.S.C. §§ 9606(b)(1) and 9607(c)(3), civil penalties and punitive damages for Defendant IES's failure without sufficient cause to comply with a May 20, 2015, EPA Order directing IES to complete the remedial design of the remedy selected for the Site.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action and over the Defendants under 28 U.S.C. §§ 1331, 1345, and 1355 and Section 113(b) of CERCLA, 42 U.S.C. § 9613(b).

3.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), because the releases and threatened releases of

hazardous substances that gave rise to the claims in this Complaint occurred in this district, and because the Site is located in this district.

## DEFENDANTS

4.      Defendant IES is a corporation organized under the laws of the State of Delaware, with its principal place of business in Covington, Kentucky.  IES has offices located in Bridgewater, New Jersey.

5.      Defendant G-I is a corporation organized under the laws of the State of Delaware, with its principal place of business in Parsippany, New Jersey.

## STATUTORY BACKGROUND

6.      CERCLA was enacted in 1980 to provide a comprehensive governmental mechanism for abating releases and threatened releases of hazardous substances and other pollutants and contaminants and for funding the costs of such abatement and related enforcement activities, which are known as "response actions."  42 U.S.C. §§ 9604(a) and 9601(25).

7.      Under Section 104(a)(1) of CERCLA, 42 U.S.C. § 9604(a)(1):

> Whenever (A) any hazardous substance is released or there is a substantial threat of such a release into the environment, or (B) there is a release or substantial threat of release into the environment of any pollutant or contaminant which may present an imminent and substantial danger to the public health or welfare, the President is authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance, pollutant, or contaminant at any time (including its removal from any contaminated natural resource), or take any other response measure consistent with the national contingency plan which the President deems necessary to protect the public health or welfare or the environment.

8.      Section 106(a) of CERCLA, 42 U.S.C. § 9606(a), provides in pertinent part:

> [W]hen the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the

> environment because of an actual or threatened release of a
> hazardous substance from a facility, he may require the Attorney
> General of the United States to secure such relief as may be
> necessary to abate such danger or threat…. The President may also
> . . . take other action under this section including, but not limited
> to, issuing such orders as may be necessary to protect public health
> and the environment.

By Executive Order 12580, dated January 23, 1987, the President's authority under Section

106(a) of CERCLA, 42 U.S.C. § 9606(a), has been delegated to the Administrator of EPA.  The

Administrator of EPA has redelegated his functions under Section 106(a) to the Regional

Administrators of EPA, including the Regional Administrator of EPA Region 2, with the

authority to redelegate such functions.  The Regional Administrator of EPA Region 2 has

redelegated his functions under Section 106(a) to the Director of the Superfund and Emergency

Management Division, formerly known as the Emergency and Remedial Response Division,

EPA Region 2.

      9.      Section 106(b)(1) of CERCLA, 42 U.S.C. § 9606(b)(1), provides in pertinent part:

> Any person who, without sufficient cause, willfully violates, or
> fails or refuses to comply with, any order of the President under
> subsection (a) of this section may, in an action brought in the
> appropriate United States district court to enforce such order, be
> fined not more than $25,000 for each day in which such violation
> occurs or such failure to comply continues.

Under the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as

amended by the Debt Collection Improvements Act of 1996, 31 U.S.C. § 3701, and the Federal

Civil Penalties Inflation Act Improvement Act of 2015 (Section 701 of Pub. L. No. 114-74), and

pursuant to EPA's Civil Monetary Penalty Inflation Adjustment Rule, 40 C.F.R. Part 19, the

maximum amount of the civil penalties provided under Section 106(b)(1) of CERCLA was

increased to $37,500 for violations occurring before November 2, 2015, and $62,689 for

violations occurring after November 2, 2015 and assessed on or after January 12, 2022.

10.   Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides in pertinent part:

> Notwithstanding any other provision or rule of law, and subject
> only to the defenses set forth in subsection (b) of this section—
>
> > (1) the owner and operator of a vessel or a facility, [and]
> >
> > (2) any person who at the time of disposal of any hazardous
> > substance owned or operated any facility at which such
> > hazardous substances were disposed of…shall be liable
> > for—
> >
> > > (A) all costs of removal or remedial action incurred by
> > > the United States Government, or a State…not
> > > inconsistent with the national contingency plan . . . .

The term "owner or operator" is defined in Section 101(20)(A) of CERCLA, 42 U.S.C.

§ 9601(20)(A), in pertinent part as "in the case of an onshore facility or an offshore facility, any

person owning or operating such facility . . . ."

11.   Section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3), provides in pertinent part:

> If any person who is liable for a release or threat of release of a
> hazardous substance fails without sufficient cause to properly
> provide removal or remedial action upon order of the President
> pursuant to section 9604 or 9606 of this title, such person may be
> liable to the United States for punitive damages in an amount at
> least equal to, and not more than three times, the amount of any
> costs incurred by the Fund as a result of such failure….

12.   Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), provides in pertinent part:

> In any such action [for recovery of the costs referred to in section
> 9607]…, the court shall enter a declaratory judgment on liability
> for response costs or damages that will be binding on any
> subsequent action or actions to recover further response costs or
> damages.

13.   Section 107(e)(1) of CERCLA, 42 U.S.C. § 9607(e)(1), provides in pertinent part:

> No indemnification, hold harmless, or similar agreement or
> conveyance shall be effective to transfer from the owner or
> operator of any…facility or from any person who may be liable for
> a release or threat of release under this section, to any other person

the liability imposed under this section.  Nothing in this subsection
shall bar any agreement to insure, hold harmless, or indemnify a
party to such agreement for any liability under this section.

## SITE DESCRIPTION AND BACKGROUND

14.    The LCP Site occupies approximately 26 acres of filled tidal wetlands located on the Tremley Point peninsula in Linden, Union County, New Jersey.  The Site is partly drained by South Branch Creek, a tidal tributary that flows 0.3 miles to the Arthur Kill.  It is bordered by the Arthur Kill to the east, industrial facilities to the north/northeast, south, and west, and partially bordered by railroad tracks to the south/southeast.  Two drainage trenches, called the Northern and Southern Off-Site Ditch, respectively, run along the Site's southern boundary.

15.    The LCP Site was owned and operated by GAF Corporation (("Old GAF"), formerly named General Aniline & Film Corporation) from the early 1950s until approximately 1971.

16.    The LCP Site was owned and operated by Linden Chlorine Products, Inc., or its successors, from approximately 1972 until the mid-1980s.

17.    The LCP Site was part of and is adjacent to a larger parcel of land in Linden, New Jersey, on which the General Aniline & Film Corporation owned and operated a multi-acre chemical facility.

18.    In the early 1950s, General Aniline & Film Corporation built a chlor-alkali manufacturing plant ("GAF Plant") on the Site and began to manufacture chemicals, including chlorine and sodium hydroxide.

19.    The GAF Plant utilized the chlor-alkali process, which created materials and byproducts that contained residual amounts of mercury.

20.    In or around 1971, Old GAF ceased chlorine manufacturing at the Site.

21.   In or around 1972, Old GAF sold the LCP Site to Linden Chlorine Products, Inc., which continued operating the GAF Plant until at least 1982.

22.   The purchase agreement between Old GAF and Linden Chlorine Products, Inc. allowed Old GAF to retain certain real property interests on the LCP Site.  These included easements over railroad tracks, the right to store railroad cars, and shared electricity generation.

23.   Old GAF, and later its successor corporation, retained ownership and operation of the adjacent chemical production facility until it ceased production activities in 1991.

24.   Residual mercury from the chlor-alkali process was discharged in the plant's wastewater and also in its leftover "brine sludge" (byproducts mixed with brine) that were pumped to an on-site earthen lagoon.

25.   Up to 20 tons per day of brine sludge, along with wastewater treatment sludge, were pumped to the lagoon.

26.   Releases from the lagoon to South Branch Creek occurred during the GAF Plant's operation.

27.   Process wastewaters from the GAF Plant and stormwaters discharged into an on-site ditch system, which ultimately discharged to South Branch Creek.

28.   From approximately 1957 to approximately 1980, hydrogen gas, a byproduct of the chlor-alkali manufacturing process, was piped from the GAF Plant to a purification, transfill, and repackaging plant operated by Union Carbide Corporation on a 2.1-acre portion of the Site leased from Old GAF (and later from Linden Chlorine Products, Inc.).

## RELATIONSHIP OF DEFENDANTS TO THE SITE

29.   In or around December 1983, a group led by Samuel J. Heyman gained control of Old GAF's Board of Directors through a stockholder vote.  Thereafter, Mr. Heyman became the Chairman of the Board of Old GAF.

30.   On or around July 1, 1986, Old GAF transferred (1) its specialty chemicals business and certain related assets and liabilities to GAF Chemicals Corporation; and (2) its building materials business and certain related assets and liabilities to GAF Building Materials Corporation.  Both companies operated as a wholly-owned subsidiaries of Old GAF.  In the transfer agreement, Old GAF expressly retained its liabilities under CERCLA.

31.   In or around August 1987, at a meeting of Old GAF's Board of Directors, Mr. Heyman reported that he was forming a management-led proposal to purchase Old GAF.

32.   On or around September 2, 1987, Mr. Heyman incorporated Newco Holdings, Inc. ("Holdings") and its subsidiary, Newco Acquisition Corp ("Acquisition").  On or around September 23, 1987, Mr. Heyman incorporated another wholly-owned subsidiary of Holdings, G Industries Corporation.  G Industries Corporation was a holding subsidiary for five additional subsidiaries that Mr. Heyman also incorporated (Dorset Inc., Edgecliff Inc., Clover Inc., Perth Inc., and Merick Inc.).  On or around August 5, 1988, Mr. Heyman incorporated G-I as a direct, wholly-owned subsidiary of Holdings.

33.   Each of the corporations in Paragraph 32 above was incorporated specifically for the purpose of effecting the leveraged buyout of Old GAF.

34.   At some point between September 1987 and March 29, 1989, Holdings distributed the stock of Acquisition through its subsidiaries so that Acquisition became a direct subsidiary of Dorset Inc., Edgecliff Inc., Clover Inc., Perth Inc., and Merick Inc.

35.   On or about October 19, 1988, to realize the leveraged buyout, Holdings and Acquisition entered into an "Agreement and Plan of Merger" with Old GAF, agreeing to merge Acquisition with and into Old GAF, with Old GAF as the surviving company.

36.   On or about March 29, 1989, Holdings, Acquisition, and Old GAF effectuated the leveraged buyout described in Paragraph 35 above.  Old GAF thus became an indirect subsidiary of Holdings and a direct subsidiary of the five subsidiaries of G Industries Corporation.

37.   On or about April 10, 1989, Old GAF entered into a "Plan of Complete Liquidation" that transferred most of its assets and related liabilities to its five direct parent companies.

38.   Under the Plan of Complete Liquidation, Dorset Inc. acquired Old GAF's assets and assumed its liabilities relating to "its acetylenic chemicals, surfactants, specialty chemicals, organometalics, mineral products…(collectively, the 'Chemicals Businesses')," along with all "liabilities arising out of (A) the production of Amiben; (B) Project Aware environmental clean-up costs; and (C) environmental claims arising out of plants currently operating in the Chemicals Businesses."  Dorset Inc. acquired nearly 88% of the fair market value of Old GAF's assets.

39.   The assets and liabilities listed in Paragraph 38 above include the assets and liabilities of both the LCP Site and the adjacent parcel of land on which Old GAF owned and operated a multi-acre chemical facility.

40.   Under the Plan of Complete Liquidation, Edgecliff Inc. acquired Old GAF's assets and assumed its liabilities relating to "its commercial and residential roofing materials business," along with all liabilities "related to the manufacture, sale or use of asbestos or asbestos-containing material" and "all liabilities arising out of (A) shingle claims for discontinued products, (B) plant shutdowns, and (C) environmental claims from plants no longer operating

and from oil waste pollution."  Edgecliff Inc. acquired nearly 10.85% of the fair market value of Old GAF's assets.

41.    Alternatively, the assets and liabilities listed in Paragraph 40 above include the assets and liabilities of the LCP Site.

42.    On or about April 10, 1989, Old GAF filed a certificate of dissolution with the Delaware Secretary of State.

43.    On or about April 11, 1989, Holdings changed its name to GAF Corporation (hereinafter "New GAF").  That same day, GAF Chemicals Corporation was merged into Dorset Inc., which was then renamed GAF Chemicals Corporation ("GAF Chemicals").  On or about April 5, 1989, Edgecliff Inc. changed its name to GAF Building Materials Corporation.

44.    A common identity of stockholders, officers, and directors, including Mr. Heyman and his management team, existed between Old GAF and New GAF.

45.    Certain owners of equity in Old GAF, including Mr. Heyman and his management team, exchanged a share of their equity in Old GAF (or consideration received for that equity) for equity in New GAF.

46.    The business operations of GAF before and after the leveraged buyout were essentially the same.  Old GAF and New GAF had the same primary location, produced goods through their subsidiaries in the same industries (chemicals and building materials) at the same plants, had the same telephone number, and employed many of the same personnel.

47.    On or about May 8, 1991, GAF Chemicals entered into a reorganization agreement that created International Specialty Products Inc. ("ISP") and its subsidiary ISP 9 Corp. (shortly thereafter renamed IES).

48.   On or about May 8, 1991, IES entered into an "Assumption of Liabilities and Continuing Obligations" agreement "in favor of" GAF Chemicals and New GAF.

49.   Under this agreement, IES assumed from GAF Chemicals "[a]ll liabilities and obligations relating to the manufacture and sale of specialty chemicals at Linden, NJ, known and unknown, contingent or otherwise, including liabilities for the remediation of the Linden site . . . ."

50.   In late 1996 or early 1997, New GAF and GAF Chemicals "spun off" ISP and IES, leaving New GAF without an ownership stake in ISP or its subsidiaries.

51.   On or about October 31, 2000, various New GAF entities engaged in a corporate restructuring involving several statutory mergers: New GAF merged into its direct subsidiary, G-I Holdings Inc., which in turn merged into its direct subsidiary, G Industries, which then merged into its direct subsidiary, GAF Fiberglass (formerly known as GAF Chemicals).  GAF Fiberglass Corporation then changed its name to GAF.  On or about November 13, 2000, GAF merged into its direct subsidiary GAF Building Materials Corporation and changed its name to G-I.

52.   As a result of these statutory mergers, Defendant G-I became the corporate successor to New GAF and, in turn, corporate successor to Old GAF.

53.   As the corporate successor to New GAF, which was the corporate successor to Old GAF, G-I is the successor-in-interest to Old GAF's liability under CERCLA notwithstanding any assumption of liabilities under the Plan of Complete Liquidation and/or IES's assumption of liabilities under the "Assumption of Liabilities and Continuing Obligations" agreement.

54.   By assuming the liabilities described in Paragraph 49 above, which included the Plan of Complete Liquidation's liabilities assumed by Dorset Inc. and described in Paragraph 38 above, IES expressly assumed the liabilities of Old GAF.

55.   Alternatively, as the successor to GAF Building Materials Corporation (formerly named Edgecliff Inc.), which assumed the Plan of Complete Liquidation's liabilities described in Paragraph 40 above, G-I expressly assumed the liabilities of Old GAF.

## COURSE OF CONDUCT

56.   In January 1995, EPA conducted a pre-remedial investigation at the Site.  Analyses of soil samples and of surface water and sediment samples indicated the presence of mercury in the soil and documented the release of mercury into South Branch Creek.

57.   On several occasions beginning in 1998, IES indicated that it was a successor to Old GAF with respect to the LCP Site.

58.   By letter dated May 29, 1998, counsel for IES responded to a Request for Information sent by EPA to New GAF pursuant to Section 104(e) of CERCLA, 42 U.S.C. § 9604(e), by referring to IES "as the successor to GAF Corporation with respect to the LCP Site."

59.   In July 1998, EPA placed the Site on the National Priorities List, 40 C.F.R. § 300.5, the list of sites considered by EPA to be national priorities for long-term evaluation and response among the known releases or threatened releases of hazardous substances, pollutants, or contaminants.

60.   On or about September 30, 1998, EPA sent several potentially responsible parties ("PRPs"), including IES, a General Notice Letter and Notice of Negotiations for the remedial investigation and feasibility study ("RI/FS").  EPA advised the PRPs of their potential liability for cleanup of the Site under CERCLA and requested a good faith offer from them to finance and/or perform the RI/FS.

61.   By letter dated November 12, 1998, IES responded to EPA with a good faith offer to perform the RI/FS.  This letter referred to GAF Corporation as IES's "predecessor."

62.   In May 1999, IES and EPA entered into an Administrative Order on Consent ("AOC") requiring IES to perform RI/FS work at the Site.

63.   IES completed an RI Report on July 15, 2013 that was later revised in October 2013.

64.   IES completed an FS Report on August 15, 2013.

65.    The RI/FS confirmed the presence of mercury and other hazardous substances (including arsenic, lead, polychlorinated biphenyls, volatile organic compounds ("VOCs"), and semi-VOCs) in surface soils and groundwater, as well as in surface waters, sediments, and low marsh soils associated with South Branch Creek and the Northern Off-Site Ditch.

66.   The RI/FS also indicated that stormwater runoff from the Site caused the migration of contaminants (including mercury) into South Branch Creek and the Northern Off-Site Ditch.

67.   In February 2014, EPA issued a Record of Decision ("ROD") describing the selected remedy for the Site.

## DEFENDANTS' LIABILITY FOR RESPONSE COSTS

68.   Each Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

69.   The LCP Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), which defines a "facility" in pertinent part as "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located . . . ."

70.   Old GAF was an "owner" and/or "operator" of the LCP Site at the time of "disposal" of a hazardous substance at the LCP Site, within the meaning of Sections 101(20), 101(29), and 107(a)(2) of CERCLA, 42 U.S.C. §§ 9601(20), 9601(29), and 9607(a)(2).

71.   IES is a successor-in-interest to Old GAF with respect to the LCP Site.

72.   G-I is a successor-in-interest to Old GAF with respect to the LCP Site.

73.   There have been "releases," within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22), and threatened releases, of "hazardous substances," within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), into the environment at or from the LCP Site, including mercury, arsenic, lead, polychlorinated biphenyls, VOCs, and semi-VOCs.

74.   As a result of the releases and threatened releases of hazardous substances at or from the Site, EPA has incurred and will continue to incur response costs, within the meaning of Sections 101(25) and 107 of CERCLA, 42 U.S.C. §§ 9601(25) and 9607, to respond to the releases and threatened releases of hazardous substances at or from the LCP Site.  As of September 20, 2021, EPA has incurred at least $5,499,803 in response costs at the LCP Site.

75.   IES is jointly and severally liable under CERCLA Sections 107(a) and 113(g)(2), 42 U.S.C. §§ 9607(a) and 9613(g)(2), for EPA's unrecovered past response costs incurred and all further response costs EPA may incur in connection with the Site.

76.    G-I is jointly and severally liable under CERCLA Sections 107(a) and 113(g)(2), 42 U.S.C. §§ 9607(a) and 9613(g)(2), for EPA's unrecovered past response costs incurred and all further response costs EPA may incur in connection with the Site.

### IES'S VIOLATION OF THE MAY 20, 2015 EPA ORDER

77.   On or about September 25, 2014, following EPA's issuance of the ROD, EPA notified IES and Praxair, Inc., a PRP that is not a subject of this Complaint, that EPA considered

them to be PRPs and requested a good faith offer from each to fully finance and/or perform remedial design and remedial action ("RD/RA") work at the Site to implement the selected remedy.

78.   By letter dated December 23, 2014, IES denied responsibility for RD/RA work, arguing that it was not a successor to Old GAF's liability at the Site.

79.   Following Praxair's and IES's refusals to provide good faith offers to perform RD/RA work at the Site, the Director of the Superfund and Emergency Management Division, formerly known as the Emergency and Remedial Response Division, EPA Region 2, determined that there was or may have been an imminent and substantial endangerment to the public health or welfare or the environment because of the actual and/or threatened releases of hazardous substances at or from the LCP Site.

80.   Thereafter, on May 20, 2015, EPA issued an order to Praxair and IES under Section 106(a) of CERCLA, 42 U.S.C. § 9606(a) (the "Order," attached as Exhibit 1), directing the parties to commit to financing and performing the RD work for the entire Site in accordance with the Order.

81.   Under Paragraph 43 of the Order, any failure to "unequivocally commit to perform or finance the Work as provided by [the] Order" is deemed a violation of the Order, and the refusing party is deemed to have failed or refused to comply with its terms.

82.   Paragraph 92 of the Order further provides that failure to comply with any provision of the Order may subject the noncomplying party to civil penalties per violation per day (42 U.S.C. § 9606(b)(1)), and punitive damages in an amount at least equal to, and not more than three times, the amount of costs incurred by the United States as a result of such failure to comply with the Order (42 U.S.C. § 9607(c)(3)).

83.   On July 14, 2015, IES notified EPA that it would not to comply with the Order and that it was asserting "sufficient cause defenses" under Sections 106(b) and 107(c)(3) of CERCLA, 42 U.S.C. §§ 9606(b) and 9607(c)(3).

84.   Because IES is a liable party at the LCP Site under CERCLA, IES lacked sufficient cause to refuse to comply with the Order.

85.   IES's failure to "unequivocally commit to perform or finance the Work as provided by [the] Order", and its failure to comply with the Order, is a violation of the Order subjecting IES to civil penalties and punitive damages.

86.   As a consequence of IES's violation of the Order, EPA has incurred and will continue to incur response costs, within the meaning of Sections 101(25) and 107 of CERCLA, 42 U.S.C. §§ 9601(25) and 9607, to respond to the releases and threatened releases of hazardous substances at or from the LCP Site.  As of September 21, 2021, EPA has incurred at least $5,499,803 in response costs at the LCP Site.

**FIRST CLAIM FOR RELIEF**
**CERCLA §§ 107(a)(2) and 113(g)(2):  RECOVERY OF RESPONSE COSTS**
**(Against all Defendants)**

87.   Paragraphs 1 to 86 are realleged and incorporated herein by reference.

88.   The Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), which defines a "facility" in pertinent part as "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located . . . ."

89.   Old GAF was "owner" and/or "operator" of the Site at the time of "disposal" of a hazardous substance, within the meanings of Sections 101(20), 101(29), and 107(a)(2) of CERCLA, 42 U.S.C. §§ 9601(20), 9601(29), and 9607(a)(2).

- 16 -

90.   Under the Plan of Complete Liquidation, Defendant IES is a successor-in-interest to Old GAF with respect to the Site.

91.   Alternatively, under the Plan of Complete Liquidation, Defendant G-I is a successor-in-interest to Old GAF with respect to the Site.

92.   As the corporate successor to New GAF, which was the corporate successor to Old GAF, Defendant G-I is a successor-in-interest to Old GAF with respect to the Site.

93.   There have been "releases," within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22), and threatened releases, of "hazardous substances," within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), into the environment at or from the Site.

94.   The United States has incurred costs of response, within the meaning of Sections 101(25) and 107 of CERCLA, 42 U.S.C. §§ 9601(25) and 9607, to respond to the releases and threatened releases of hazardous substances.

95.   The costs of the response actions taken and to be taken by the United States in connection with the Site are not inconsistent with the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"), promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, and codified at 40 C.F.R. Part 300.

96.   Defendant IES is jointly and severally liable under Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), as persons who at the time of disposal of hazardous substances owned and/or operated a facility, as defined in Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), at which such hazardous substances were disposed of.

97.   Defendant G-I is liable under Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), as a person who at the time of disposal of hazardous substances owned and/or

operated a facility, as defined in Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), at which such hazardous substances were disposed of.

98. Pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), the United States is entitled to a declaratory judgment that Defendants are jointly and severally liable to the United States under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for future response costs to be incurred by the United States with respect to the Site and not inconsistent with the NCP.

## SECOND CLAIM FOR RELIEF
### CERCLA § 106(b)(1):  CIVIL PENALTIES FOR FAILURE WITHOUT SUFFICIENT CAUSE TO COMPLY WITH THE ORDER
### (Against Defendant IES)

99. Paragraphs 1 to 86 are realleged and incorporated herein by reference.

100. On May 20, 2015, EPA issued the Order pursuant to CERCLA Section 106(a), 42 U.S.C. § 9606(a), requiring Defendant IES to undertake the RD for the selected remedy.

101. On July 14, 2015, Defendant IES notified EPA that it was refusing to comply with the Order.  To date, Defendant IES has not complied with the Order.

102. Defendant IES lacked sufficient cause to refuse and to fail to comply with the Order.

103. Pursuant to CERCLA Section 106(b)(1), 42 U.S.C. § 9606(b)(1), the Court should impose civil penalties for IES's refusal and failure to comply with the Order.

## THIRD CLAIM FOR RELIEF
### CERCLA § 107:  PUNITIVE DAMAGES FOR FAILURE WITHOUT SUFFICIENT CAUSE TO COMPLY WITH THE ORDER
### (Against Defendant IES)

104. Paragraphs 1 to 86 are realleged and incorporated herein by reference.

105.  On May 20, 2015, EPA issued the Order pursuant to CERCLA Section 106(a), 42 U.S.C. § 9606(a), requiring Defendant IES to undertake the RD for the remedy selected in the ROD.

106.  On July 14, 2015, Defendant IES notified EPA that it was refusing to comply with the Order.  To date, Defendant IES has not complied with the Order.

107.  The United States has incurred additional costs as a result of Defendant IES's refusal and failure to take the actions required by the Order, including enforcement costs.

108.  Defendant IES lacked sufficient cause to refuse and to fail to comply with the Order.

109.  Pursuant to CERCLA Section 107(c)(3), 42 U.S.C. § 9607(c)(3), the Court should impose punitive damages for Defendant IES's refusal and failure to comply with the Order.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff United States respectfully requests that this Court:

a.      Enter judgment in favor of the United States, under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), holding Defendants IES and G-I jointly and severally liable for all unreimbursed costs incurred by the United States regarding the Site, including interest;

b.      Enter a declaratory judgment, pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), against Defendants IES and G-I on liability for response costs or damages that will be binding in any action or subsequent actions to recover further response costs, including enforcement costs, plus interest thereon;

c.      Order Defendant IES to pay civil penalties of up to $37,500 for violations occurring before November 2, 2015, and $62,689 for violations occurring after November 2,

2015 and assessed on or after January 12, 2022, for each day IES refused or failed to comply

with the Order;

        d.      Order Defendant IES to pay punitive damages of up to three times the amount of

response costs the United States incurred in performing the remedial design at the Site, including

enforcement costs;

        e.      Award the United States its costs of this action; and

        f.      Grant such other and further relief as the Court deems appropriate.

Respectfully submitted,


TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice


\_\_\_\_\_s/ John Broderick _____
JOHN BRODERICK
R. SHEA DIAZ
NATALIE G. HARRISON
Trial Attorneys
U.S. Department of Justice
Environmental & Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Washington, DC 20044-7611
(202) 305-0302
john.broderick@usdoj.gov
(202) 514-3211
Rebecca.diaz@usdoj.gov
(202) 305-0461
natalie.g.harrison@usdoj.gov


PHILIP R. SELLINGER
UNITED STATES ATTORNEY


BEN KURUVILLA
Assistant United States Attorney
U.S. Attorney's Office

970 Broad Street, Suite 700
Newark, NJ 07102
(973) 297-2085
Ben.Kuruvilla@usdoj.gov

Of Counsel:
Krista E. Yacovone
Gerard Burke
Assistant Regional Counsels
U.S. Environmental Protection Agency
Region II
290 Broadway, 17th Floor
New York, NY 10007-1866

<u>CERTIFICATION UNDER LOCAL RULE 11.2</u>

In accordance with 28 U.S.C. § 1746, I hereby certify under penalty of perjury, that the matter in controversy in the foregoing Complaint is not the subject of any other action pending in any court, or any pending arbitration or administrative proceeding. However, the parties named as Defendants in this Complaint are participants <u>in Ashland, LLC et al. v. G-I Holdings Inc. et al.</u>, a pending matter in New Jersey Superior Court, Morris County, Law Division, Docket No. MRS-L-2331-15; and in <u>Ashland Inc. et al v. The Samuel J Heyman 1981 Continuing Trust for Lazarus S. Heyman et al.</u>, a pending matter in Delaware Superior Court, New Castle County, C.A. No. N15C-10-176 EMD CCLD. The claims in those proceedings sound in state law, while the claims alleged in this Complaint arise under CERCLA, a federal statute.

The parties in the New Jersey Superior Court proceeding include:

- Ashland LLC (f/k/a Ashland Inc.)
- International Specialty Products, Inc.
- ISP Environmental Services, Inc.
- G-I Holdings, Inc.
- Standard Industries Inc. (f/k/a Building Materials Corp. of America)
- GAF Corporation
- John and Jane Does 1–20
- ABC Companies 1–20

Additionally, the parties named in the First Amended Complaint in the Delaware Superior Court include:

- Ashland Inc.
- International Specialty Products Inc.
- ISP Environmental Services Inc.
- ISP Chemco Inc.
- The Samuel J. Heyman 1981 Continuing Trust for Lazarus S. Heyman
- The Samuel J. Heyman 1981 Continuing Trust for Eleanor S. Heyman
- The Samuel J. Heyman 1981 Continuing Trust for Jennifer L. Heyman
- The Samuel J. Heyman 1981 Continuing Trust for Elizabeth D. Heyman
- The Lazarus S. Heyman Age 50 Trust for Assets Appointed Under Will of Lazarus S. Heyman
- The Eleanor S. Heyman Age 50 Trust for Assets Appointed Under Will of Lazarus S. Heyman
- The Jennifer L. Heyman Age 50 Trust for Assets Appointed Under Will of Lazarus S. Heyman
- The Elizabeth D. Heyman Age 50 Trust for Assets Appointed Under Will of Lazarus S. Heyman
- The Horizon Holdings Residual Trust

- RFH Investment Holdings LLC
- The 2013 Samuel J. Heyman 1981 Continuing Trust for Lazarus S. Heyman
- The 2013 Samuel J. Heyman 1981 Continuing Trust for Eleanor Heyman Propp
- The 2013 Samuel J. Heyman 1981 Continuing Trust for Jennifer Heyman Millstone
- The 2013 Samuel J. Heyman 1981 Continuing Trust for Lazarus S. Heyman
- The 2013 Samuel J. Heyman 1981 Continuing Trust for Elizabeth Heyman Winter
- The 2013 Lazarus S. Heyman Age 50 Trust for Assets Appointed Under Will of Lazarus S. Heyman
- The 2013 Eleanor Heyman Propp Age 50 Trust for Assets Appointed Under Will of Lazarus S. Heyman
- The 2013 Jennifer Heyman Millstone Age 50 Trust for Assets Appointed Under Will of Lazarus S. Heyman
- The 2013 Elizabeth Heyman Winter Age 50 Trust for Assets Appointed Under Will of Lazarus S. Heyman
- The 2015 Horizon Holdings Residual Trust for Lazarus S. Heyman
- The 2015 Horizon Holdings Residual Trust for Jennifer Heyman Millstone
- The 2015 Horizon Holdings Residual Trust for Elizabeth Heyman Winter
- Linden Property Holdings, LLC.

s/ Natalie G. Harrison
NATALIE G. HARRISON
Trial Attorney
United States Department of Justice
Environment & Natural Resources
Division
P.O. Box 7611
Washington, DC 20044
(202) 305-0461

*Counsel for the United States*