UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ISP ENVIRONMENTAL SERVICES INC., et al.,<br><br>Defendants. | Civil Action No. 22-4344 (JXN)<br><br>OPINION AND ORDER |

**CLARK, Magistrate Judge**

**THIS MATTER** comes before the Court on a motion by Plaintiff the United States of America (the "United States") seeking leave under Federal Rule of Civil Procedure 15(a)(2) to amend its Answer to Counterclaim-Plaintiff G-I Holdings Inc.'s ("G-I") Counterclaim (the "Answer"). Dkt. No. 169. G-I opposes the United States' motion. Dkt. No. 174. The United States replied. Dkt. No. 177. The Court has carefully considered the relevant submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, the United States' motion [Dkt. No. 169] is **GRANTED**.

**I.     BACKGROUND**

On June 30, 2022, the United States filed this Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C.A. §§ 9601 *et seq.*, case against Defendants ISP Environmental Services Inc. ("IES") and G-I (collectively, "Defendants"). Dkt. No. 1 ("Compl."). Generally, the United States seeks the recovery of past and future unreimbursed costs in connection with its cleanup of hazardous substances released at the LCP Chemicals, Inc. Superfund Site in Linden, New Jersey (the "Site"). Compl. at p. 2.

In the 1950s, General Aniline & Film Corporation ("GAF") built a chlor-alkali manufacturing plant (the "GAF Plant") on the Site and began manufacturing chemicals there, including chlorine and sodium hydroxide. *Id.* at ¶ 18. GAF owned and operated the Site until 1971, at which time chlorine manufacturing at the Site ceased. *Id.* at ¶¶ 15. The Site was sold to Linden Chlorine Products, Inc. ("LCP") in 1972, although GAF retained ownership over an adjacent parcel of land and, until 1991, also operated a chemical production facility there. *Id.* at ¶¶ 17, 21, 23. LCP continued to operate the GAF Plant until 1982. *Id.* In the late 1980s, after a series of corporate mergers, Defendant G-I became the corporate successor to GAF.[1] Like G-I, Defendant IES is a successor in interest to GAF. *Id.* at ¶¶ 71-72.

As part of its chemical manufacturing process, the GAF Plant created materials and byproducts containing residual amounts of mercury. *Id.* at ¶ 19. "Residual mercury from the chlor-alkali process was discharged in the plant's wastewater and also in its leftover "brine sludge" (byproducts mixed with brine) that were pumped to an on-site earthen lagoon." *Id.* at ¶ 24. "Up to 20 tons per day of brine sludge, along with wastewater treatment sludge, were pumped to the lagoon." *Id.* at ¶ 25. Ultimately, contaminated wastewaters from the GAF Plant resulted in the South Branch Creek, a tributary to the Arthur Kill River, a tidal straight spanning Staten Island and Union and Middlesex Counties, New Jersey. *Id.* at ¶¶ 25-27.

In 1995, the Environmental Protection Agency ("EPA") conducted a pre-remedial investigation at the Site. *Id.* at ¶ 56. Soil and surface water samples of the South Branch Creek and surrounding areas indicated the presence of mercury there. *Id.* In July of 1998, the EPA placed the Site on the National Priorities List, 40 C.F.R. § 300.5. *Id.* at ¶ 59. Shortly thereafter, the EPA

---

[1] The Complaint distinguishes between "Old GAF," which owned the site beginning in the 1950s, and "New GAF," which was created in 1989 following a series of corporate mergers. *See* Compl. at ¶¶ 29-51.

confirmed the presence of mercury and other hazardous substances (including arsenic, lead, polychlorinated biphenyls, volatile organic compounds ("VOCs"), and semi-VOCs). *Id.* ¶ 65. Relevant here, the United States alleges that both G-I and IES are liable under Section 107(a)(2) of CERCLA because, under the meaning of CERCLA, they owned and/or operated the Site at the time of disposal of hazardous substances. *Id.* at ¶¶ 96-97. The United States therefore seeks to hold G-I and Defendant IES jointly and severally liable for all unreimbursed cleanup costs for the Site. *Id.* at p. 19.

On July 8, 2022, IES moved to dismiss the Complaint. Dkt. No. 5. On August 26, 2022, the United States requested, in light of this "multiparty, complex civil action," a stay of discovery pending resolution of IES's motion to dismiss. Dkt. No. 24. Finding good cause for the stay, the Court granted the United States' request on August 30, 2022. Dkt. No. 25. In September of 2022, G-I filed an Answer and a Third Party Complaint, and asserted a Crossclaim against IES and a Counterclaim against the United States. Dkt. Nos. 26, 28. On May 7, 2024, the Court issued an Opinion & Order denying IES's motion to dismiss. Dkt. Nos. 55-56. IES moved for reconsideration, which was denied in December of 2024. Dkt. Nos. 59, 142. While its reconsideration motion was pending, IES filed an Answer to the Complaint, a Third-Party Complaint, and a Counterclaim against the United States. Dkt. No. 66. The United States filed an Answer to G-I's Counterclaim on July 2, 2024, which Answer is the subject of this motion. Dkt. No. 67.

On October 30, 2024, the Court held an initial conference with the parties and a Pretrial Scheduling Order was entered. Dkt. No. 135. The Court trifurcated discovery. The parties are currently in Phase I of discovery, which pertains to corporate successorship to CERCLA liability at the Site, including liability for G-I. *See id.* The Pretrial Scheduling Order set an initial deadline

for motions to amend of March 28, 2025. *Id.* at ¶ 16. Subsequently, the parties filed numerous motions to dismiss, all of which remain pending before this Court. *See* Dkt. Nos. 146-149, 151, 182. On March 31, 2025, the Court, on consent, extended the deadline for the filing of any motions to amend to April 4, 2025. Dkt. No. 168. On April 3, 2025, the United States filed the present motion to amend to correct its Answer to G-I's Counterclaim. Dkt. No. 169. G-I filed an opposition to the United States' motion to amend on April 14, 2025. Dkt. No. 174. The United States replied. Dkt. No. 177.

The United States, in seeking leave to amend, proposes three revisions to its Answer to G-I's Counterclaim "to clarify [its] responses to accurately reflect information the United States has reviewed in discovery." Dkt. No. 169 at p. 3. There are three paragraphs of the United States' Answer which are at issue—the United States' responses to Paragraphs 15, 19, and 25 of G-I's Counterclaim. *See* Dkt. No. 169-2 (proposed "First Am. Answer"). Before turning to G-I's relevant allegations against the United States, additional background on G-I's Counterclaim is required.

At its core, G-I's Counterclaim aims to hold the United States responsible for "any releases of hazardous substances at or from the [] Site" between the years 1942 and 1965, since, as G-I alleges, the United States was an owner and operator of the Site during those years. If true, the United States would be responsible for CERCLA contribution. *See generally* Dkt. No. 26 ("G-I Counterclaim"). Specifically, G-I alleges that the United States' actions, primarily the actions of the Department of the Treasury, the Department of Justice, and the Office of Alien Property during World War II, transferred ownership of GAF to the United States from 1942 until 1965. *Id.*

GAF was originally founded in 1929 as an American arm of German chemicals trust, IG Farber. *Id.* at ¶ 7. Around that time, GAF "operated multiple chemicals and dyestuffs facilities in

4

the United States," including the Site in Linden. *Id.* at ¶ 8. However, with the onset of World War II, "tensions between the United States and the Axis Powers increased." *Id.* at ¶ 11. As a result, the United States "issued controls under the Trading With the Enemy Act to freeze all German-owned assets within the United States, including [] GAF." *Id.* Following Pearl Harbor, December 7, 1941, the United States seized GAF and vested ownership in the Office of Alien Property Custodian, then an arm of the Department of Justice. *Id.* at ¶ 14. In 1942, the Treasury Department issued a publication expressing concern over German personnel employed by GAF and the ways in which GAF and its industrial manufacturing would be used to serve German interests during the War. *Id.* at ¶ 12. Responding to such concerns, the United States dismissed "[t]wenty-five of [GAF's] key executive personnel . . . and all department heads" in January of 1942. *Id.* at ¶ 13.

Moving next to the relevant allegations, G-I's Counterclaim further alleges that:

- Paragraph 15: "The Government immediately sought not only to take ownership of [] GAF, but to thoroughly Americanize the company, and took further steps to transform the company to cut off any German ties." Such steps included "sweeping changes of technical and management personnel."

- Paragraph 19: "In total, the Government dictated the dismissal of about 100 American citizens from Old GAF, including directors and other corporate officers, department heads, engineers, scientists, and key operators."

- Paragraph 25: Further action by the Government included its "identif[ication of] [] GAF's existing exclusive sales contract with another IG Farben-owned [German] entity, General Dyestuff Corporation, as another mechanism of German control over Old GAF's operations. The Government therefore seized this contract (among others) and directly asserted control over Old GAF's sales and basic sales policy."

5

*See id.* In its Answer, the United States admitted Paragraphs 15 and 19 in full. As to Paragraph 25, the United States admitted that the Office of Alien Property seized General Dyestuff Corporation in or around June 1942, but denied the remaining allegations.

Now, based on discovery, the United States seeks leave to amend its Answer to Paragraphs 15, 19, and 25 as follows:

- Paragraph 15: Admit in part and deny in part, stating that "less than all of the stock of [GAF]" was vested in the United States in February of 1942 and that "[a]fter the stock was vested, the United States took further steps to cut off any German ties." Otherwise, denying all other allegations. Dkt. No. 169-2 at p. 4.

- Paragraph 19: Admit that the United States "dictated the dismissal of about 100 American citizens from [] GAF including directors and other corporate officers, department heads, and engineers," but deny the remaining allegations. *Id.*

- Paragraph 25: Admit that the "Office of Alien Property seized less than all of the stock of General Dyestuff Corporation in or around June 1942," but deny the remaining allegations. *Id.* at p. 25.

*See* First Am. Compl. at ¶¶ 15, 19, 25. In sum, the United States would retract its full admission of Paragraphs 15, 19, and 25 and amend its Answer "to accurately reflect information the United States has reviewed in discovery." Dkt. No. 169 at ¶¶ 3-4.

## II. DISCUSSION

Because the United States' motion was made prior to expiration of the deadline for moving to amend, its motion is governed by Federal Rule of Civil Procedure 15. Under Rule 15(a), "a party may amend its pleading only with the opposing party's written consent or the court's leave" and "[t]he court should freely give leave when justice so requires." The decision to grant leave to amend rests within the sound discretion of the trial court. *Zenith Radio Corp. v. Hazeltine Research Inc.,* 401 U.S. 321, 330 (1970). In determining a motion for leave to amend, Courts consider the

6

following factors: (1) undue delay on the part of the party seeking to amend; (2) bad faith or dilatory motive behind the amendment; (3) repeated failure to cure deficiencies through multiple prior amendments; (4) undue prejudice on the opposing party; and/or (5) futility of the amendment. *See Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 174 (3d Cir. 2010) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  In addition, "[t]he Third Circuit has consistently emphasized the liberal approach to pleading embodied by Rule 15." *Endo Pharma v. Mylan Techs Inc.*, 2013 WL 936452, at *2 (D. Del. Mar. 11, 2013).  The Court should only deny leave when these factors "suggest that amendment would be 'unjust'. . . ." *Arthur v. Maersk, Inc.*, 434 F.3d 196, 203 (3d Cir. 2006).

G-1 argues that the United States has not satisfactorily explained its attempt to withdraw its former admissions, as it has not specifically identified the information revealed in discovery that would justify amendment here.  Dkt. No. 174 at p. 1.  On the contrary, G-I submits, the United States' former admissions are directly supported by the record.[2]  G-1 attaches several exhibits in support of its position.  *See* Dkt. Nos 174-1-174-6.[3]  As such, G-I urges denial of the United States' motion on the basis that the United States has not asserted a "good reason" "to change a substantive admission to a denial."  In support of its proposition, G-I cites *Griffiths v. CIGNA Corp.*, 857 F.Supp. 399, 406 (E.D. Pa. 1994), *aff'd*, 60 F.3d 814 (3d Cir. 1995).  Dkt. No. 174 at pp. 1-2.

*Griffiths*, however, is distinguishable.  *Griffiths* involved a motion for judgment as a matter of law ("JMOL") by the defendant, CIGNA, who was attempting to raise a new affirmative defense

---

[2] According to G-I, the allegations in Paragraphs 15, 19, and 25 of its Counterclaim are "well supported by publicly-available documents and documents in the Government's possession, including United States Government reports and Congressional records." Dkt. No. 174 at p. 4.
[3] The Court has reviewed and considered G-I's exhibits in support of its Opposition. Although these documents appear to bear directly on the substantive issues in this case, the Court will grant the United States' motion on Rule 15 grounds alone and thus declines to address them herein.

7

after trial. Notably, CIGNA had already raised the same issue on a motion to amend and a motion for summary judgment, both of which were denied. *Id.* at p. 404. In its previously denied motion to amend, CIGNA sought to retract its unqualified admission that plaintiff exhausted her employment discrimination claims and instead sought to deny exhaustion entirely. *See Griffiths*, 857 F. Supp. at 404. The *Griffiths* court explained that CIGNA's proposed amendment would "cause great prejudice, would cause further undue delay, and [was] of questionable [good] faith." *Id.* Mere "inadvertence" by the defendant was not enough to justify the proposed amendment, since it would have "depriv[ed] the court of subject matter jurisdiction and subject[ed] the plaintiff to a devastating loss of forum . . . ." *See id.* at 405.[4] Moreover, defendant's proposed amendment was "irreconcilable and inconsistent with admissions in their original answer." *Id.* at 405-06. Focusing on prejudice, the *Griffiths* court noted that permitting amendment would have imposed "severe prejudice on plaintiff" since defendant sought withdrawal of its admission after trial, following appeal, and after a remand order was entered.

Here, unlike in *Griffiths*, the United States does not attempt to assert a waived affirmative defense, the case is far less developed, and the United States' proposed amendments are not entirely "irreconcilable and inconsistent" with its original admissions to the relevant allegations in G-I's Counterclaim. Thus, the suggested "good reason" language in *Griffiths* is inapplicable and Rule 15's liberal standard applies. *See Great Western Mining & Mineral Co.*, 615 F.3d at 174; *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997).

First, the United States has not unduly delayed in bringing its motion. On the contrary, it filed the present motion within the timeframe for moving to amend set by the Court. *See* Dkt. Nos.

---

[4] Defendant's admission of exhaustion apparently was based on a misreading (or non-reading) of documents in its possession. *Griffiths*, 857 F. Supp. At 406.

135, 168. Second, the record does not evince any bad faith. The United States asserts that its proposed amendments "accurately reflect information [] [it] has reviewed in discovery." Dkt. No. 169 at ¶ 3; *see also* Dkt. No. 177 at pp. 3-6. The United States states that its document review "has made clear that G-I's original allegation was broader than the evidence, at least to date, supports." Dkt. No. 177 at pp. 4, 6. Thus, its proposed amendments admit certain allegations and deny others that it believes are unsupported, in accordance with the Federal Rules. *See* Dkt. No. 177 at p. 4. Furthermore, in reply, the United States provides sufficient explanation for each of its proposed amendments. *See* Dkt. No. 177 at pp. 4-7 (United States responding to G-I's documentary evidence and explaining basis of information underlying each of its proposed amendments). Moreover, G-I does not allege futility or dilatory motive. As such, the Court need not consider those factors.

Finally, concerning prejudice, the Court finds that permitting the United States to amend its Answer would not cause undue prejudice to G-I. *See Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001) (examining prejudice and considering "whether allowing an amendment would result in additional discovery, cost, and preparation to defend against new facts or new theories"). The United States, seemingly accurately, submits that its amendments would "not necessitate additional discovery, because the United States already addressed the same issues in its document production and written responses to discovery." Dkt. No. 177 at p. 7. The United States also does not present any new defenses that G-I would need to defend against, and there is ample time for G-I to develop and prosecute its counterclaim against the United States. Accordingly, for the reasons stated, the Court will permit the United States to amend its Answer to G-I's Counterclaim.

### III. CONCLUSION AND ORDER

The Court having considered the papers submitted pursuant to Fed. R. Civ. P. 78, and for the reasons set forth above;

**IT IS** on this on this 11th day of September, 2025,

**ORDERED** that the United States' motion to amend [Dkt. No. 169] is **GRANTED**; and it is further

**ORDERED** that the United States shall file its proposed First Amended Answer within **seven (7) days** of the date of this Order and serve a copy on all parties.

                                            *s/ James B. Clark, III*
                                            **JAMES B. CLARK, III**
                                            **United States Magistrate Judge**